1
2
3
4
5                      IN THE UNITED STATES DISTRICT COURT

6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    TRACI CHARLES,                              No. C-05-00044 EDL

9              Plaintiff,                        **ORDER GRANTING DEFENDANT'S**
                                                 **MOTION FOR SUMMARY JUDGMENT**
10      v.

11   NIKE, INC.,

12             Defendant.
     _____/
13

14   **I.  INTRODUCTION**

15          Plaintiff Traci Charles, an African American woman, started working at Niketown in January

16   1997.  Niketown is Nike's flagship store in San Francisco.  Throughout her career at Niketown,

17   Plaintiff received generally positive reviews from all her managers, but her performance was

18   punctuated with repeated disciplinary "coaching notes" and reminders regarding her attendance,

19   performance, and conflicts with managers.  Her relationship with Nike began to deteriorate in 2003,

20   and broke down on February 20, 2004, when McCallester Dowers, Niketown's African American

21   Store Manager, personally witnessed Plaintiff commit some serious errors while closing the store

22   that night.  Over the next few days, Dowers decided to terminate Plaintiff.

23          Plaintiff sued her former employer in state court, alleging that her supervisors discriminated

24   against her on the basis of her gender and race, wrongfully denied her reasonable accommodation

25   and terminated her because of her disability, wrongfully denied her request for medical leave, and

26   retaliated against her, thereby violating the California Fair Employment and Housing Act and the

27   California Family Rights Act.  See Cal. Gov. Code §§ 12940, 12945.2 (2005).  Plaintiff also asserted

28   claims for wrongful termination in violation of public policy and for intentional infliction of

**United States District Court**
For the Northern District of California

1  emotional distress.  Nike removed the case to this Court on diversity grounds and brought this

2  Motion for Summary Judgment against each of Plaintiff's claims.  Both parties were represented by

3  counsel, who argued the Motion before the Court on November 29, 2005.  Having carefully

4  considered the evidence and the arguments of the parties, the Court hereby GRANTS summary

5  judgment for Defendant.

6  **II.  FACTUAL BACKGROUND**

7  In January 2001, Assistant Store Manager Mara Ott promoted Plaintiff to the position of

8  Operations Assistant and became her new manager.  See Declaration of Mara Ott in support of

9  Defendant's Motion for Summary Judgment ("Ott Decl.") ¶¶ 2-3.  Ott, a Caucasian woman, gave

10 Plaintiff a positive year-end review in July 2002, highlighting her improvements in attendance,

11 communication, professionalism, commitment to deadlines and results orientation, and commending

12 her for a pattern of hard work and improvement.  Id., Ex. 2 at P0034 (improvement since mid-year

13 review when Ott noted that Plaintiff's "level of support to the team player role and professional

14 communications has been varied and inconsistent").

15 On February 19, 2003, Plaintiff contacted Nike Employee Relations Strategic Process

16 Manager Melissa Marks and told her about a difference in full-time working status between two

17 other employees, one Asian American, the other African American, and stated that another

18 employee told Plaintiff that Ott was "overinvolved" in returns by African American customers.  See

19 Declaration of Melissa Marks in support of Defendant's Motion for Summary Judgment ("Marks

20 Decl.") ¶¶ 1, 10.  Marks began to investigate and discussed Plaintiff's concerns with Ott.  Id. ¶ 14.

21 The next day, Plaintiff wrote to Marks that she did not trust anybody at Niketown, and that she felt

22 harassed as the result of an inconclusive "Loss Prevention Investigation" initiated after $1,500

23 disappeared from the store's safe, but that never resulted in any employee being disciplined.  Id. ¶

24 11, Ex. 49.

25 In July 2003, Plaintiff received another year-end review from Ott, who rated her as

26 "Achieves."  Declaration of Plaintiff in opposition to Defendant's Motion for Summary Judgment

27 ("Charles Decl."), Ex. I (July 19, 2003 review) at Nike 0780.  "Achieves" is the second highest

28 rating Nike gives to employees; "Excels" is the highest.  Id.; see also Declaration of McCallester

Dowers in support of Defendant's Motion for Summary Judgment ("Dowers Decl.") ¶ 15.  What transpired when Ott and Plaintiff met to discuss the review is disputed: Ott maintains that Plaintiff was aggressive, threatening and unprofessional, Plaintiff contends that she never raised her voice.  Ott Decl. ¶ 22; Charles Decl. ¶ 25.  Ott told Dowers, her supervisor, that Plaintiff had raised her voice and been unprofessional during the meeting.  Ott Decl. ¶ 27; Dowers Decl. ¶¶ 6, 15.  Dowers and Ott decided that Plaintiff should receive a Final Warning for her unprofessional behavior, as Plaintiff had received several other written and verbal warnings since 1997.  See Ott Decl. ¶ 27, Exs. 4-5, 11, 28-32 (earlier warnings), 16 (Final Warning); Dowers Decl. ¶ 16.  Although the Final Warning is dated July 23, 2003, Plaintiff did not learn that she had received it until December 2003, when she received another disciplinary warning referencing the Final Warning.  Charles Decl. ¶ 27.

In early February 2004, Plaintiff again spoke with Marks and complained that Ott was difficult to work with.  Marks Decl. ¶ 19.  Marks offered to schedule a facilitated discussion with the two of them, and they both accepted.  Id.; Charles Decl. ¶ 33; Ott Decl. ¶ 37.  On February 13, 2004, Plaintiff called Ott at home.  Ott Decl. ¶ 38; Charles Decl. ¶ 33.  Plaintiff was upset because the store manager on duty had closed a cash register in order to train another employee, which Plaintiff worried would cause accounting errors for which she would be blamed.  Charles Decl. ¶ 33.  Although Plaintiff denies that she raised her voice during this discussion, Ott and a coworker who overheard the call both told Dowers that Plaintiff yelled at Ott on the phone.  See id. (Plaintiff denies raising her voice); Ott Decl. ¶¶ 38-39 (Ott told Dowers that Plaintiff raised her voice and was threatening); Declaration of Tracy Thompson in support of Defendant's Motion for Summary Judgment ("Thompson Decl."), Ex. 89 (De Silva Dep.) at 31:12-34:3, 46:6-23; Dowers Decl. ¶ 18 (both Ott and De Silva reported screaming incident to Dowers).

On February 9, 2004, Ott implemented the "Zone Chart," a new break policy that ensured coverage in the store at all times.  Ott Decl. ¶ 40, Ex. 23.  Although the Zone Chart had been used before, Ott for the first time explicitly applied it to Operations Assistants like Plaintiff.  Id.  Nine days later, another employee told Ott that Plaintiff had not followed the Zone Chart, taking an early break without manager authorization and preventing another employee from taking his break.  Declaration of Cozetta Stewart in support of Defendant's Motion for Summary Judgment ("Stewart

3

Decl.") at ¶ 6; Ott Decl. ¶ 40, Ex. 22; cf. Charles Decl. ¶ 34 (Plaintiff had obtained prior approval from manager Layton). Ott reported this incident to Dowers. Ott Decl. ¶ 40; Dowers Decl. ¶ 19.

On February 20, 2004, as he was leaving the building for the day, Dowers "saw an unusually long line of customers at the cash register [. . . in] the busiest part of the store." Dowers Decl. ¶ 20. Upon investigation, Dowers found that one of the two cash registers in the area appeared to be closed, and that the two cashiers present were working on a single register, slowing down the check-out process and creating a long line of customers. Id. As it was thirty-minutes before closing, Dowers felt that both registers should have been opened for business. Id. When he questioned the cashiers, Dowers learned that Plaintiff had closed one of the registers and told them not to use it. Id. ¶ 21. Dowers saw that a "Closed" sign had been placed on the register, and that the cash in the register had been counted and sorted. Id. ¶¶ 20-21. When he called Plaintiff, however, she denied that she had closed it. Id. ¶ 21. (She later admitted that she did place a "Closed" sign on the register. Id.; see also Thompson Decl., Ex. 61 (hereinafter, "Charles Dep.") at 355:21-24). Dowers personally assisted the cashiers until Melissa Layton, another manager, replaced him and he left. Dowers Decl. ¶ 22. Later that night, Plaintiff reported a shortage of approximately $700, although in fact the registers were only off by $0.48. Charles Dep. at 357:11-359:9; see also Ott Decl. ¶ 46, Ex. 24. Before they were able to sort out Plaintiff's accounting errors, Layton and DeSilva called Dowers and reported a cash shortage of several hundred dollars and told him that Plaintiff "had been carrying the entire day's deposit of approximately $12,000 in cash around the store, rather than taking small amounts at intervals" to the safe, thus placing herself and her coworkers in danger, and exposing Nike to the risk of theft. Dowers Decl. ¶ 24. Dowers instructed the managers to call Ott and review the situation with her. Id. ¶ 25.

Layton and DeSilva then called Ott and told her that Plaintiff was breaching Nike cash-handling protocol by carrying $12,000 in cash around the store, and that she appeared confused and unable to reconcile the cash from the registers. Ott Decl. ¶¶ 42-44 (reporting that the managers told her that Plaintiff was committing "a serious breach of procedure" and that leaving the money "lying out increased the risks of accounting errors and loss or theft. . . . There are no circumstances which would have justified having the entire deposit out on the sales floor"), Ex. 26 (Ott summary of

events); <u>see also</u> Charles Dep. at 251:22-252:19, 355:11-357:10 (agreeing that she was carrying at least several thousand dollars with her from register to register, put a closed sign on a register and told cashiers not to use it, and admitting that she nonetheless told Dowers that she had not put a closed sign on the register); <u>cf.</u> Charles Decl. ¶ 36 (denying that she was carrying entire day's deposit of $12,000). Ott had to come into work the next day (her day off) to reconstruct what had happened. Ott Decl. ¶ 46. Dowers thought that terminating Plaintiff was appropriate due to this incident alone, and his opinion was further reinforced by Plaintiff's other recent problems. Dowers Decl. ¶¶ 27-28. He informed Ott of his intention, and she agreed that termination was appropriate. <u>Id.</u> ¶ 28; Ott Decl. ¶ 47.

On February 23, 2004, Dowers informed Marks that he wanted to terminate Plaintiff, but agreed to meet with her to give her an opportunity to explain her side of the incident. Dowers Decl. ¶ 30; Marks Decl. ¶ 21; Declaration of Counsel in support of opposition to Defendant's Motion for Summary Judgment ("Hopkins Decl."), Ex. 4 (Marks Dep.) at 32:20-24 ("he said that he was considering [terminating Plaintiff] but he hadn't made his decision yet"). After Dowers spoke with Marks on February 23rd, Plaintiff called Dowers to request that he schedule her to work additional hours that week or, if she could not work more hours, whether he would allow her to use her paid time off ("PTO"). Charles Dep. at 146:13-23, 214:25-217:7 ("So, I take it that what you were trying to do was work more hours, not fewer hours that week; is that a fair statement?  Correct").[1] She then informed him that she was "coming off the medication [and] experiencing . . . a lot of anxiety and depression." Supplemental Declaration of Tracy Thompson ("Supp. Thompson Decl."), Ex. 95 (Charles Dep.) at 207:2-7. Plaintiff also told Dowers that Ott did not like African Americans, that working with Ott was stressful, and that Ott was harassing her because of her race. Charles Dep. at 146:20-149:10, 214:15-219:12. Dowers pointed out that this was unlikely since Ott reported to him,

---

[1] Plaintiff had made similar requests to use PTO to supplement her hours in the past, and had been told that she could use PTO only to replace regularly-scheduled hours when she was unable to work, not to supplement regular hours that had been cut down for budgetary reasons. See Stewart Decl. ¶ 5 ("I informed Ms. Ott that Ms. Charles had called me that morning [and] requested that I input Paid Time Off for her for the preceding week because she had worked only thirty hours. I reported this to Ms. Ott because I did not have the authority to comply with this request"); Ott Decl. ¶¶ 31-33, Exs. 17-18 (confirming conversation with Stewart and detailing different conversation with Plaintiff where Plaintiff made request directly to Ott; attaching email chain with Plaintiff re PTO).

1    an African American.  Id. at 217:10-20.

2      On February 24, 2004, Dowers met with Ott and Plaintiff to discuss the events of the 20th.

3    Ott Decl. ¶ 50; Dowers Decl. ¶ 32.  At the conclusion of the discussion, Dowers suspended Plaintiff

4    with pay, and told her that he would contact her on February 26th to discuss her employment status.

5    Dowers Decl. ¶ 33; Charles Decl. ¶ 38.  This meeting led Plaintiff to think that she was going to be

6    fired.  Charles Dep. at 372:11-19; Thompson Decl., Ex. 86 (Dr. Roberts Dep.) at 121:11-13.  Dowers

7    then called Marks, explained that Plaintiff had failed to provide any information that changed his

8    desire to terminate her, and asked Marks to process the required termination paperwork; he also

9    started drafting Plaintiff's termination letter.  Dowers Decl. ¶¶ 34-36; Hopkins Decl., Ex. 4 (Marks

10   Dep.) at 32:12-15 ("He told me that he wanted to terminate.  He needed to check with his manager

11   Jennifer Rohde and confirm that she supported the decision"), Ex. 5 (Dowers Dep.) at 149:4-150:18

12   (describing how conversation with Plaintiff did not change his mind, in part because he felt that she

13   had misled him).

14     On February 26, 2004, Marks approved the final draft of the termination letter and requested

15   that human resources effect termination and process Plaintiff's final paycheck.  Dowers Decl. ¶ 38,

16   Exs. 35-36; see also Marks Decl. ¶ 25, Ex. 56.  On the same day, Dowers called Plaintiff and asked

17   her to meet him at the store on the 28th at 10 a.m.  Dowers Decl. ¶ 39.  On the evening of the 27th,

18   Plaintiff faxed and emailed her request under the Family Medical Leave Act ("FMLA") for two

19   months of leave to treat her anxiety and depression, attaching a certificate signed by her psychiatrist.

20   Charles Decl. ¶ 40; Dowers Decl. ¶ 40, Ex. 37.  After consulting with Marks, Dowers determined

21   that he would deny Plaintiff's FMLA request because they had already made the decision to

22   terminate her and she thus no longer was an employee entitled to medical leave benefits.  Marks

23   Decl. ¶ 27; Dowers Decl. ¶ 42.  Dowers communicated this to Plaintiff by email on March 1st,

24   attaching her termination letter and informing her that he would separately send her final paycheck.

25   Dowers Decl. ¶ 42, Ex. 40.  Plaintiff responded that she was on leave for two months.  Id., Ex. 41.

26     Plaintiff then spoke with Marks and told her that she wanted to appeal her termination

27   internally.  Marks Decl. ¶ 28.  She also told Marks for the first time that Ott had discriminated

28   against her based on her race.  Charles Dep. at 432:4-8.  After Nike denied her appeal, she filed suit.

**III. OBJECTIONS**

**A. Plaintiff's Evidentiary Objections**

1. Dr. Roberts' deposition and notes

Plaintiff objects to Defendant's use of testimony and notes by her psychiatrist, Dr. Roberts, that corroborate Plaintiff's own testimony that she thought, by February 25, 2004, that she was going to be fired. Plaintiff's objections that this evidence violates the psychotherapist-patient privilege recognized by California Evidence Code section 1014 and is hearsay are not well taken. First, this evidence falls into the patient-litigant exception, as Plaintiff has tendered her mental and emotional condition at issue in this litigation both by claiming that she was disabled because of depression and anxiety, and by filing a claim for intentional infliction of emotional distress. Second, Plaintiff has waived the privilege by voluntarily testifying about this very conversation with Dr. Roberts. See Charles Dep. at 372:11-16 ("Did you tell [Dr. Roberts] you thought you were going to be fired by Nike?  Yes"). Finally, Federal Rule of Evidence 803(4) provides a specific hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment." Accordingly, the Court overrules Plaintiff's objections as to the deposition testimony and notes by Dr. Roberts.

2. Evidentiary objections

Without obtaining the prior approval of the Court, Plaintiff filed "Objections to Evidence Cited in Reply Memorandum" fifteen days after filing her Opposition, and six days before the hearing. In addition to violating Local Rule 7-3(d), these objections are not proper objections to evidence, but rather are attempts to refute and re-characterize evidence cited in Defendant's Motion for Summary Judgment. Plaintiff should have addressed these arguments in her Opposition, not with a belated, improperly-filed pleading. The Court overrules these objections.

**B. Defendant's Objections**

1. Late filed documents

Defendant asks the Court to strike the declarations of Dr. David Roberts, Marlaney Davis, James Hayes, Grace Cloyd, and Plaintiff's counsel, as well as a number of exhibits, on the ground that they were filed one day late. While the Court disapproves of late filings, Defendant has not established that this short delay was prejudicial. The Court accordingly denies Defendant's Motion

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

1   to Strike these declarations.

2        Late on November 27, 2005, two days before the hearing, Plaintiff also filed a declaration by

3   Rachelle Macias.  Defendant objected and asked the Court to strike this late-filed document.  In the

4   alternative, Defendant asked the Court to consider a supplemental declaration by McCallester

5   Dowers that responded to some of the issues raised in Macias' declaration.  Plaintiff's counsel stated

6   that he had known that Macias might have useful information, and had asked her to provide a

7   declaration well in advance of the date the Opposition to the Motion for Summary Judgment was

8   due, but that Macias had refused to provide one until the eve of the hearing.  He also stated that

9   Plaintiff chose not to depose Macias in order to control costs.  Although the Court greatly

10  disapproves of such last-minute filings, it will allow the declaration in this instance.  The Court

11  therefore also admits the Supplemental Declaration of McCallester Dowers ("Dowers Supp. Decl."),

12  that addresses the limited relevance of Macias' evidence, as she left Niketown around March 19,

13  2003 and thus would not have observed any of the key events that led Dowers to terminate Plaintiff.

14       The Court hereby orders Defendant to electronically file the Dowers' Supplemental

15  Declaration, which Defendant lodged with the Court at the hearing.  In addition, pursuant to the

16  Court's request, Defendant provided a full transcript of Plaintiff's deposition.  When the Court asked

17  the parties whether they objected to the Court relying on some additional pages of Plaintiff's

18  deposition which neither party had provided, the parties did not object.  The Court accordingly

19  orders Defendant to electronically file a copy of pages 155-162, 206 and 209 of Plaintiff's

20  deposition transcript.  <u>Defendant shall file these documents on or before January 13, 2006.</u>

21            2.       Violation of Local Rule 7-4(b)

22       Plaintiff violated Local Rule 7-4(b) by filing a twenty-six page memorandum.  Defendant's

23  request to strike page twenty-six of the Opposition is granted.

24            3.       Failure to submit signed declarations

25       Plaintiff originally electronically filed unsigned copies of her own declaration, as well as

26  unsigned copies of the declarations of Tasha Knighten and Dr. David Roberts.  At the hearing on

27  Defendant's Motion, the Court ordered Plaintiff to file signed copies of all documents.  As of the

28  date of this Order, Plaintiff has submitted signed copies of her declaration and that of Ms. Knighten.

She still has not submitted a signed copy of Dr. Roberts' declaration.  Accordingly, Defendant's Motion to Strike the declarations of Plaintiff and Ms. Knighten is denied, and Defendant's Motion to Strike the declaration of Dr. David Roberts is granted.

4.        Evidentiary objections

Defendant objects to numerous passages in Plaintiff's declaration.  The Court overrules the objections, except as follows:

In paragraph 8 of her declaration, Plaintiff states that "[w]hen [she] asked Wong had management approach[] him, he responded, 'no, I just went to Cal [Dowers] and asked him and Cal told me yes.'"  Defendant's hearsay objection is sustained.

In paragraph 13 of her declaration, Plaintiff states that she received a note to file, "while Quan did not."  Plaintiff lays no foundation for her statement that Quan did not receive a note to file, and the Court has been unable to find any foundation for it in the record.  Accordingly, Defendant's objection is sustained as to "while Quan did not."

In paragraph 22 of her declaration, Plaintiff states that in February 2003 she "expanded on why she felt she was being treated differently [and specifically] complained that Mara Ott (Caucasian) was discriminating against Plaintiff because of her race in many aspects of Plaintiff's employment, including her not being allowed to move into management.  Plaintiff then provided Marks with the recent examples."  Defendant correctly points out that this statement unequivocally contradicts Plaintiff's earlier deposition testimony where she admitted in no uncertain terms that she did not make any complaints to Marks concerning herself until after she was terminated.  Charles Dep. at 421:6-22, 422:7-10, 432:4-8 ("[B]efore your termination, did you ever tell Melissa Marks that you thought Mara Ott was discriminating against you based on your race, did you?  No").  Pursuant to Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9th Cir. 1975) and Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991), the Court sustains Defendant's objection on the ground that a plaintiff is not allowed to create "sham issues of fact" by introducing self-serving statements that directly contradict sworn deposition testimony.

Similarly, in paragraph 26, Plaintiff declares that in July 2003 she "stated to Dowers that Ott treats Black people differently and that Plaintiff needed to move out of Ott's department

9

**United States District Court**
For the Northern District of California

1   immediately." In her deposition, however, Plaintiff testified that the <u>first</u> time she complained to

2   Dowers that Ott was discriminating against her based on her race was on February 23, 2004. <u>See</u>

3   Charles Dep. at 430:22-431:3 ("[S]o February 23, 2004[] is the first time you told Mr. Dowers that

4   you thought Mara Ott was discriminating against you based on your race, correct? Yes"). The

5   Court accordingly also sustains this objection on the same ground.

6          In paragraph 27, Plaintiff declares that she "immediately observed errors in the document.

7   (A true and correct copy is attached hereto as Exh. J. Exh. J is different from Def's Exh 15 to Dec.

8   of Ott) . . . When Ott learned that Plaintiff had properly reported the incident to a manager, Ott then

9   removed those references and gave Plaintiff the revised 'Note to file.'" Defendant objects both to

10  this passage and to Exhibit J on the ground that, even though it propounded numerous discovery

11  requests in response to which Exhibit J should have been produced, Plaintiff failed to produce the

12  document until November 9, 2005, when she filed her declaration opposing the Motion for Summary

13  Judgment. <u>See</u> Supp. Thompson Decl. ¶ 5, Ex. 91 (Def.'s Disc. Reqs.) at nos. 1, 11, 12, 16, 19, 26.

14  The Court therefore sustains Defendant's objection to Exhibit J to Plaintiff's Declaration, and to any

15  reference to that document.

16         The Court sustains in part Defendant's objection to paragraph 36. The sentence beginning

17  with "Plaintiff could not have been carrying the entire day's deposit . . ." and ending with "simply

18  observe how much money she was carrying" is argumentative. The Court also sustains Defendant's

19  objections that the sentences beginning with "This is not true" through the end of the paragraph are

20  argumentative and lack foundation.

21         In paragraph 37, line 20, Plaintiff states that she "reiterated" her concerns about Ott's racism

22  to Dowers on February 23, 2004 and that she told Dowers that the change in medication was made

23  because of "this stress in her working environment." As explained above, Plaintiff unequivocally

24  admitted that this conversation was the *first* time that she had complained to Dowers that Ott was

25  discriminating against her because of her race. Furthermore, even though Defendant exhausted her

26  recollection in her deposition, she did not testify there that she told Dowers that the change in

27  medication was due to her stressful working environment. <u>See</u> Charles Dep. at 219:8-18. The Court

28  accordingly sustains Defendant's objections to the word "reiterated" and to the phrase "Plaintiff

1    explained that because of this stress in her working environment[.]"

2        Exhibit G to Plaintiff's declaration contains handwritten notes, and the Court sustains

3    Defendant's objections to the exhibit to the extent that Plaintiff seeks to rely on unauthenticated

4    handwritten notes as she has not laid any foundation as to the source, the timing, or the meaning of

5    these notes.[2]

6    **IV. DISCUSSION**

7        **A. Summary Judgment Standard**

8        Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

9    admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

10   material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

11   56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

12   material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  However, the moving party has

13   no burden to negate or disprove matters on which the non-moving party will have the burden of

14   proof at trial.  The moving party need only point out to the court that there is an absence of evidence

15   to support the non-moving party's case.  Celotex, 477 U.S. at 325.  The burden then shifts to the

16   non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'"  Id.

17   477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must

18   ─────────────────────────────

19       [2] In paragraph 38 of her declaration, Plaintiff states that she "was not given any indication that
     she would be terminated."  Similarly, in paragraph 40, she declares that "[p]rior to receiving [Plaintiff's
20   medical leave request], Dowers had not provided Plaintiff with any indication that she would be
     terminated."  In her deposition, however, Plaintiff specifically and unequivocally admitted that, by
21   February 25, 2005, she thought that there was some chance that she was going to be fired. Charles Dep.
     at 372:11-19 (admitting that she told her psychiatrist that she thought that she was going to be fired).
22   The Court overrules Defendant's objections that this portion of the declaration is "sham" and should be
     stricken because the passive wording in Plaintiff's declaration is too vague to necessarily contradict her
23   deposition testimony.  The Court nonetheless notes that these statements do not create a genuine issue
     of fact because regardless of whether Plaintiff was given "any indication" that she was going to be fired,
     she still thought that she was going to be terminated.
24       In addition to Ms. Macias, four of Plaintiff's former Niketown coworkers submitted declarations
25   in opposition to the Motion for Summary Judgment.  Most of the declarations only contain general
     statements about Plaintiff's personality and dedication, but one contains more specific opinions about
26   Niketown's managers and need for diversity training.  Defendant objects to a number of statements in
     these declarations, principally on foundation and relevance grounds.  The Court agrees that some of
27   these statements (e.g., Tasha Knighten's opinion that "management sticks together") may indeed cross
     the line into inadmissible opinion and argument, and may lack foundation, but errs on the side of
     overruling the objections.  As explained below, however, these declarations nonetheless fail to address
28   any genuine material fact as to the specific events and reasons for management's decisions regarding
     Plaintiff.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   "do more than simply show that there is some metaphysical doubt as to the material facts."

2   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 ( 1986).  "The mere

3   existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury

4   could reasonably find for the [non-moving party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

5   252 (1986).  Evidence that "is merely colorable, or is not significantly probative," is not sufficient to

6   avoid summary judgment.  Anderson, 477 U.S. at 249-250.

7        Summary judgment cannot be granted where a genuine dispute exists as to any material fact.

8   Fed. R. Civ. P. 56(c).  A "material" fact is one which might affect the outcome of the case under the

9   applicable law.  Anderson, 477 U.S. at 248.   A dispute about a material fact is genuine if a

10  reasonable jury could return a verdict for the non-moving party.  Id.  In deciding a motion for

11  summary judgment, a court must view the evidence in the light most favorable to the non-moving

12  party, and draw all justifiable inferences in its favor.  Anderson,  477 U.S. at 255.  Moreover,

13  "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

14  from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary

15  judgment."  Id.; see also Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999) (citing Lowe v. City

16  of Monrovia, 775 F.2d 998, 1008 (9th Cir. 1986)).

17      **B. Plaintiff's Claims of Race and Gender Discrimination**

18       Plaintiff complains that Defendant discriminated against her in violation of the California

19  Fair Employment and Housing Act by terminating her, disciplining her more harshly than other

20  employees, and excluding her from the Advanced Training Program because of her race or gender.

21          1.   Disparate Treatment

22       To establish a prima facie case for disparate treatment under the California Fair Housing and

23  Employment Act, Plaintiff must establish that (1) she is a member of a protected class, (2) she was

24  performing her job competently and/or was qualified for the position she sought, (3) that adverse

25  action was taken against her, and (4) the existence of some facts that would give rise to an inference

26  of unlawful discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973);

27  Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 1993), as amended (9th Cir. 1994); Guz v.

28  Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000).  Plaintiff is an African American woman, she

1   received satisfactory evaluations, she was terminated, and analyzing the facts in the light most

2   favorable to her, she provided sufficient evidence of a prima facie case of discrimination as to her

3   termination.  See, e.g., Charles Decl. ¶ 37; Declaration of Tasha Knighten in Opposition to

4   Defendant's Motion for Summary Judgment ("Knighten Decl.") ¶¶ 4, 11-13.

5          Plaintiff, however, did not satisfy her burden of creating a triable issue that her not being

6   selected for the Advanced Training Program was discriminatory.  Plaintiff's only evidence of

7   alleged discrimination is that no African American women participated in the program, while the

8   only employees selected were Asian American men.  Charles Decl. ¶ 2.  Defendant, however,

9   provided uncontradicted evidence that the program was highly selective and that only employees

10  without any attendance issues qualified for entrance into the program.  Dowers Decl. ¶ 45, Ex. 42

11  ("To be considered, each employee must have an achieves or above rating on their most recent CFE,

12  no disciplinary action within the last 6 months, no attendance issues, and the recommendation of

13  their immediate supervisor. . . Ultimately, the Store Manager recommends promotability. . . .

14  Ensure that those chosen to train are the best of the best!"); see also Hopkins Decl., Ex. 2 (Gonzalez

15  Dep.) at 33:11-16 ("individuals who were not needing corrective action, who were top perform[ers]

16  within the organization").  Since becoming Store Manager in July 1999, Dowers only had

17  recommended two employees (out of 300 at the store) for the program.  Dowers Decl. ¶¶ 1, 48.

18  Unlike Plaintiff, both employees that Dowers selected satisfied the criteria for the Advanced

19  Training Program.  Id. ¶ 53; cf. id. ¶¶ 52, 55 (Plaintiff did not have the recommendation of her

20  immediate supervisor nor that of Dowers); Ott Decl. Exs. 28, 31, 32 (documenting Plaintiff's history

21  of attendance issues).

22         In response to Plaintiff's prima facie showing as to her termination, Defendant provided

23  undisputed, non-discriminatory reasons for terminating Plaintiff: most significantly, the February

24  20th store closing incident, as well as Plaintiff's repeated attempts to use PTO to supplement her

25  hours.  Dowers Decl., Ex. 40 (termination letter); see also Section II, supra.  As explained above,

26

27

28

**United States District Court**

For the Northern District of California

1   Plaintiff admitted most of the events of February 20th, which are thus undisputed.[3]  Accordingly,

2   Plaintiff had to proffer admissible evidence sufficient to create a triable issue of material fact that

3   Defendant's stated reasons for terminating her were pretextual.  See Texas Dep't of Cmty. Affairs v.

4   Burdine, 450 U.S. 248, 256 (1981) (once employer articulates legitimate, non-discriminatory reason

5   for termination, plaintiff must show reason is pretextual "either directly by persuading the court that

6   a discriminatory reason more likely motivated the employer or indirectly by showing that the

7   employer's proffered explanation is unworthy of credence"); Guz, 24 Cal. 4th at 360.  Plaintiff has

8   not met this burden.  First, Plaintiff has not offered any direct evidence that she was terminated

9   because of her race or gender rather than for repeated performance issues culminating in the

10  February 20, 2004 store closing incident.

11      Second, the circumstantial evidence Plaintiff offered is not "specific and substantial"

12  evidence of discrimination.  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998); see

13  also Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095-96 (9th Cir. 2005) (circumstantial evidence

14  "must be 'specific and substantial' to defeat employer's motion for summary judgment"); Winarto v.

15  Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1284 (9th Cir. 2001) ("To establish pretext,

16  'very little' direct evidence of discriminatory motive is sufficient, but if circumstantial evidence is

17  offered, such evidence has to be 'specific' and 'substantial'") (citing Godwin).  Plaintiff provided

18  several declarations by other Niketown employees which, in general terms, state their belief that

19  Plaintiff behaved professionally when they observed her and that management, especially Ott, was

20  unfair and difficult.  None of them, however, observed the specific incidents that Store Manager

21  Dowers, himself an African American, relied upon in deciding to terminate Plaintiff.  Most

22  importantly, none of these declarants was present on February 20, 2004 during the store closing

23  incident, whereas Dowers was present and personally observed the problems created by Plaintiff's

24  actions.  Nor did any of them testify that employees who were men or who were not African

25

26          [3]  Plaintiff does create a triable issue that she obtained manager approval before closing some
    registers early on February 20th and thus argues that she was disciplined unfairly by Dowers and Ott.
27  However, her testimony does not create a triable issue that she obtained manager approval to close down
    that particular cash register, which was located in the busiest part of the store.  Cf. Ott Decl. Ex. 26
28  (Layton told Plaintiff to close registers that were not being used); Dowers Decl. ¶¶ 20-21 (area where
    Plaintiff shut down register was "busiest part of the store").  Plaintiff's declaration therefore does not
    address whether she had permission to close down the register at issue.

American but engaged in similar behavior to Plaintiff's during that incident were not terminated.

For example, Tasha Knighten, a supervisor in another department, felt that Plaintiff was an "outstanding employee at Niketown," whereas "Ott did not handle a lot of things fairly[,]" and Knighten "felt that she was difficult to work under[.]" Knighten Decl. ¶¶ 7, 9-10.  Knighten also stated her own opinion that managers had stereotypical views of African American employees and treated them differently.  Id. ¶¶ 11-13.  But her general impressions, unsupported by specific examples of disparate treatment of similarly situated employees of other racial backgrounds, is not specific or substantial.  While Knighten's testimony on the use of PTO is specific, it is consistent with Defendant's evidence that PTO may only be used for taking time off when scheduled to work.  See id. ¶ 14.  Similarly, she does not address Ott's specific evidence about a new policy implemented on February 9, 2004 which explicitly required Operations team members like Plaintiff to follow the Zone Chart. See Ott Decl. ¶ 40, Ex. 23 (email entitled "Covering Brks [sic] and lunches" stating that "[i]n order for this to be successful I am adding the operations team members to the zone chart each day . . .  Coverage is indicated and who is expected to be where. *Please try to stick to what I have set*.  This will ensure fair and appropriate coverage of the lunches and breaks. . . .") (emphasis added).  Knighten is silent regarding any sex discrimination.

The rest of Plaintiff's declarants actually left Niketown well before the events that led Dowers to terminate Plaintiff:  Marlaney Davis left in September 2002, Grace Cloyd left in 1999, Rachelle Macias left in March 2003, and James Hayes left in 1997.  None of them therefore was in a position to observe the incidents leading to Plaintiff's termination in February 2004.  While Davis states that employees expressed concerns that Ott was difficult to work with (Davis Decl. ¶ 4), she does not assert that those employees were African American or that Ott was difficult only with African American employees.  The fact that Davis has never heard of anyone being disciplined for supplementing their hours with PTO (Id. ¶ 5) is of very marginal relevance as she has not established nor even suggested that other employees tried to use PTO not to replace scheduled hours which they took off, but instead to earn additional pay for more than their scheduled hours.  By contrast, Defendant presented evidence that Dowers was told that Plaintiff made that request to other employees at least twice in addition to the February 23, 2004 conversation where Plaintiff asked

United States District Court

For the Northern District of California

1   Dowers directly to supplement her hours with PTO. Davis' declaration also states that it was

2   acceptable to deviate from the posted break schedule, "so long as [employees] obtained a manager's

3   approval." Id. ¶ 6. Davis left over one year before Ott implemented the new coverage policy in

4   February 2004. And while Plaintiff avers that she did obtain her manager's approval before taking

5   her break (Charles Decl. ¶ 34), her coworker reported the contrary to Ott, and Ott in turn

6   communicated Plaintiff's disregard for the procedure to Dowers (Stewart Decl. ¶ 6; Ott Decl. ¶ 40,

7   Ex. 22). Thus Dowers, the key decision-maker, had a basis for believing that Plaintiff violated the

8   policy.

9        The belated declaration of Rachelle Macias also fails to raise a triable issue of fact. First, as

10  noted above, she stopped working at the store as of March 2003 (Dowers Supp. Decl. ¶ 2), more

11  than a year before the precipitating events leading to Plaintiff's termination. As Assistant Store

12  Manager – Product, reporting to Dowers, she was not responsible for Operations, and she did not

13  supervise Operations Assistants like Plaintiff. Id. ¶¶ 2-3. She testifies that it was common to carry

14  the deposit on the selling floor while closing down registers and to begin closing at least an hour

15  before the store closed, but she has not established any foundation for whether this continued to be

16  the practice after March 2003. Nor has she established any foundation for whether the practice of

17  closing down the registers early applied to the busiest registers in the store. More importantly, she

18  does not address the specific situation on February 20, 2004 that troubled Dowers when he

19  personally observed a long line of customers waiting in the busiest part of the store. Nor does she

20  address Plaintiff's undisputed mistake about a major cash shortfall in the registers that night that

21  forced other employees to waste time trying to reconcile what was actually less than a one dollar

22  discrepancy. Macias' opinion on the use of PTO fails to address the distinction between being paid

23  for time off when scheduled to work, as opposed to being paid beyond regularly-scheduled hours.

24  Even accepting her testimony regarding the impropriety of being disciplined on un-communicated

25  corrective actions and failure to follow a break schedule, Plaintiff's evidence of pretext still does not

26  rise to the level of a triable issue of fact regarding discrimination against her based on race or gender

27  in view of the other bases for Dowers' decision – especially the February 20th incident.

28       Notably, Plaintiff fails to provide any evidence that any men or non-African American

16

1   employees who created the type of problems that ensued during the February 20, 2004 store closing

2   were treated differently.  Indeed, Plaintiff herself, when questioned at deposition, admitted that she

3   does not think that her termination was discriminatory based on race or gender.  Charles Dep. at

4   451:14-25 ("[I]s it your opinion or belief that Mr. Dowers made the decision to terminate you

5   because of your race?  No.  Do you believe Mr. Dowers made the decision to terminate you based on

6   your gender?  No"), see also 86:11-14 (she never heard any manager or supervisor at Nike making a

7   derogatory comment about race), 125:23-126:4 (she does not believe that Ott is racist), 155:21-

8   162:23 (admitting that she has no facts to support her belief that Ott, DeSilva and Dowers

9   discriminated against her because of her race), 162:24-163:8, 169:8-172:20, 173:15-20 (Dowers

10  never made any derogatory comments about women).  Furthermore, to the extent that she argues that

11  Dowers merely supported Ott who did have an animus towards her, that argument is not only

12  speculative, but contrary to the undisputed evidence that Dowers' decision to terminate Plaintiff was

13  triggered by his own personal observation of her actions on February 20, 2004.  Also, Ott's prior

14  promotion of Plaintiff "is strong evidence that the employer is not biased against the protected class

15  to which the employee belongs."  Coghlan, 413 F.3d at 1096 ("same actor" inference applies where

16  manager who hired plaintiff demoted him three years later in part because "this length of time would

17  be significant only had Coghlan proffered evidence suggesting that Andreassen developed a bias

18  against Norwegians during that period; but he did not").  Plaintiff has not suggested that Ott

19  developed a bias against African Americans or women between the time she promoted Plaintiff and

20  the time Plaintiff was fired.

21              2.      Disparate Impact

22          Plaintiff's argument about disparate impact seems to rest on the alleged under-representation

23  of African American women in supervisory or managerial roles at Niketown, the ambiguity of the

24  process for admission into the Advanced Training Program, and the fact that she asked to enter the

25  program but was not selected, whereas three Asian American men were chosen (two by Dowers).

26  Although Plaintiff suggests that acceptance into the program is completely discretionary, Defendant

27  provided program materials setting forth objective as well as subjective requirements for entrance.

28  See Dowers Decl. ¶¶ 44-45, Ex. 42 (employees must have no attendance issues and no disciplinary

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1  actions within six months, and explaining that Store Manager has ultimate discretion–and

2  responsibility–to recommend only employees who are "the best of the best").

3        Plaintiff's evidence is insufficient to raise a disputed issue of fact.  While she points out that

4  only two African American women have held supervisory positions at Niketown between 2000 and

5  2004, and that no African American women were accepted into the Advanced Training Program, she

6  offers no evidence of the racial and gender composition of the pool of qualified employees and

7  applicants.  See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51 (1989) (reversing Court

8  of Appeal's ruling that a comparison of the percentage of low wage workers in cannery who are

9  nonwhite and the percentage of high wage workers in cannery who are nonwhite makes out a prima

10  facie case of disparate impact), superseded by statute on other grounds, Civil Rights Act of 1991,

11  Pub. L. No. 102-166, 105 Stat. 1074; Carter v. CB Richard Ellis, Inc., 122 Cal. App. 4th 1313, 1323-

12  26 (2004) (discussing Wards Cove and reiterating that plaintiffs in disparate impact cases need to

13  provide evidence of composition of entire work force and of subset affected by employment

14  practice).  In a disparate impact case, a plaintiff "'must not merely prove circumstances raising an

15  inference of discriminatory impact; he must prove the discriminatory impact at issue. . . .'  This is

16  usually done by establishing 'that an employment practice selects members of a protected class in a

17  proportion smaller than their percentage in the pool of actual applicants."  Lowe, 775 F.2d at 1004

18  (citations omitted) (affirming summary judgment on disparate impact claim because plaintiff failed

19  to support her allegations with any evidence, including "proper statistical record"); see also Ibarbia

20  v. Regents of the Univ. of Cal., 191 Cal. App. 3d 1318, 1330 (1987).

21        When Plaintiff was terminated in 2004, Niketown had nine management positions, of which

22  six were held by men, three by women, two by African Americans, three by Caucasians, two by

23  Hispanics and two by Asian Americans.  Hopkins Decl., Ex. 6 (Def.'s interrog. resp.) at 2.  The top

24  position was held by an African American man, Dowers.  While management therefore appears to be

25  racially diverse, the Court cannot determine whether it deviated from the eligible pool of minorities

26  and women because Plaintiff has not provided that evidence.  Nor has Plaintiff provided any

27  evidence that suggests that the Advanced Training Program was a prerequisite for advancement in

28  the company, or that having no African American women in the Advanced Training Program was

18

1  statistically significant.  Indeed, as it is undisputed that only three employees out of three hundred

2  working at Niketown were selected for the program, Plaintiff would have difficulty proving

3  statistical significance on this point.

4             3.      Pattern or Practice

5        To prevail on a pattern or practice theory of discrimination, Plaintiff must set forth evidence

6  sufficient to create a triable issue of material fact that Defendant had discriminatory intent.  See

7  EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273 (11th Cir. 2000) (both disparate treatment and

8  pattern and practice theories require plaintiffs to show discriminatory intent, while disparate impact

9  does not).  As she did with her disparate impact claim, Plaintiff argues, *ipso facto*, that because there

10  are no African American women supervisors, there must be discriminatory intent.  This is not

11  enough to create a disputed issue.

12  **C. Plaintiff's Claim for Disability Discrimination**

13        Plaintiff argues that she was disabled as of February 23, 2004, due to stress and depression,

14  and that Dowers knew or should have known of her disability as of that date.  Plaintiff claims that

15  Defendant violated FEHA by denying her reasonable accommodation for her psychiatric disability

16  in the form of medical leave and by firing her after she requested medical leave.  Once an employee

17  brings to her employer's attention her inability to perform a particular job without accommodation

18  because of a disability, the employer must engage in good faith in an interactive process and make

19  reasonable accommodations for that employee if any exist.  Cal. Gov. Code §§ 12940(m)-(n); see

20  also Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000) (duty to engage in interactive

21  process is mandatory under Americans with Disabilities Act once employee gives notice of her

22  disability and expresses request for accommodation); Guz, 24 Cal. 4th at 354 ("Because of the

23  similarity between state and federal employment discrimination laws, California courts look to

24  pertinent federal precedent when applying our own statutes. . . .  In particular, California has adopted

25  the three-stage burden-shifting test established by the United States Supreme Court for trying claims

26  of discrimination").  While an employee need not use any particular words in requesting an

27  accommodation, she must put the employer on notice that it needs to explore an accommodation in

28  plain terms.  See Barnett, 228 F.3d at 1112 ("An employee requesting a reasonable accommodation

United States District Court<br>For the Northern District of California

19

1    should inform the employer of the need for an adjustment due to a medical condition using 'plain

2    English' and need not mention the ADA or use the phrase 'reasonable accommodation''') (citing

3    EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA,

4    EEOC Compliance Manual (CCH), § 902, No. 915.002 (March 1, 1999), at 5438) (internal

5    quotations omitted); see also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)

6    ("What matters under the ADA are not formalisms about the manner of the request, but whether the

7    employee . . . provides the employer with enough information that, under the circumstances, the

8    employer can be fairly said to know of both the disability and the desire for an accommodation").

9        At the end of Plaintiff's February 23, 2004, phone call to Dowers, Plaintiff told him: "'You

10   know what?  I'm coming off these meds, and I'm having a really hard time at work'. . . and he said

11   'I don't want to hear about that.'" Charles Dep. at 219:8-11; see also Supp. Thompson Decl. Ex. 95

12   (Charles Dep.) at 207:2-16 (Plaintiff told Dowers that she "was coming off the medication, and [she]

13   was experiencing . . . a lot of anxiety and depression" and that Dowers "said, 'I don't want to hear

14   that'").[4]  Dowers does not recall discussing this topic at all, so Plaintiff's testimony on this point is

15   undisputed.  Also undisputed is the fact that Dowers knew that Plaintiff had been seeing a

16   psychiatrist for work-related stress for almost a year.

17       If this testimony about stress and medication alone told the whole story of the February 23,

18   2004 conversation, Plaintiff might well have raised a triable issue of fact as to whether Defendant

19   breached its duty to engage in the interactive process.  Significantly, however, Plaintiff began the

20   same conversation by asking Dowers if she could work *more* hours than scheduled that week, not

21   fewer, much less whether she could take a leave of absence.  Plaintiff's complaints to Dowers thus

22   focused on her wanting to work more hours, and on her frayed relationship with Ott.  See Charles

---

[4]    At her deposition, Plaintiff was asked whether she had "exhausted [her] recollection on everything that [she] and Cal Dowers said to each other" on February 23rd, and she replied affirmatively.  Charles Dep. at 219:15-18.  Nonetheless, in her declaration, she adds that she called Dowers to "express concerns that her work environment under Ott was becoming stressful for her. . . *because* of this stress in her working environment, her physician and psychiatrist were discussing changing her medication because her feelings of anxiety and depression were resurfacing again. Plaintiff asked Dowers whether something could be done to change her situation under Ott."  Charles Decl. ¶ 37 (emphasis added).  Thus, Plaintiff's declaration starkly differs on this point from her prior sworn deposition testimony.  See Charles Dep. at 214:15-219:18.  Accordingly, this portion of her declaration also should be stricken.  Even assuming it is admissible, however, it does not change the Court's analysis.

United States District Court
For the Northern District of California

1   Dep. at 217:10-25, 219:3-12; Charles Decl. ¶ 37.  Furthermore, Dowers knew that Plaintiff had been

2   under successful treatment by a psychiatrist for some time due to work stress.  See Charles Dep. at

3   205:12-211:18.  Therefore, her mention that she was coming "off her medication" and suffering

4   depression at the end of a conversation that she began by requesting more hours does not raise a

5   triable issue of fact that she put Dowers on notice of her disability and need for accommodation as of

6   February 23, 2004.

7         Moreover, Plaintiff did not ask her psychiatrist to help her obtain an accommodation until

8   February 25, and her psychiatrist did not tell her to ask Defendant for any kind of accommodation

9   before she sent her leave request on February 27th.  Charles Dep. at 211:20-212:2, 377:20-378:22.

10  Instead of leading Dowers to think that Plaintiff had a condition that made the achievement of a

11  major life activity difficult, Plaintiff's comments led Dowers to infer that Plaintiff was complaining

12  about Ott and requesting that Dowers find her a new supervisor.  Therefore, Defendant's duty to

13  engage in the interactive process was not triggered by the February 23, 2004 conversation between

14  Plaintiff and Dowers.  Cf. Claudio v. Regents of the Univ. of Cal., 134 Cal. App. 4th 224, at **45-48

15  (2005) (in reversing summary judgment against plaintiff, noting that even though plaintiff made

16  formal request for accommodation after employer gave notice of intent to medically separate

17  employee, defendant employer nonetheless responded with offer of interactive process to employee,

18  so it was too late for defendant to argue that it need not engage in interactive process).

19        It is unclear whether Plaintiff also claims that she was denied reasonable accommodation

20  because Dowers decided not to reassign her to a different supervisor.  See Opp'n 16-17.  If she is,

21  she should have offered evidence to create a triable issue that another position was available.  She

22  has not, however, pointed to any other potentially suitable position.  While reassignment may, in

23  some circumstances, be an appropriate accommodation, Plaintiff has provided this Court with no

24  evidence to suggest that in her case it was either possible or reasonable.  Cf. Buckingham v. United

25  States, 998 F.2d 735, 740 (9th Cir. 1993) (transfer to vacant position may be reasonable

26  accommodation under ADA, but plaintiff must show that such position was available).  There is no

27  evidence, for example, that anyone other than Ott, who was Assistant Store Manager for Operations,

28  supervised Operations Assistants like Plaintiff.  Nor has Plaintiff indicated that she was willing to

United States District Court

For the Northern District of California

1   accept a different position, if indeed any was vacant.

2        Plaintiff also failed to raise a triable issue of fact that her termination was based on her

3   disability.  First, Dowers knew about her being under psychiatric treatment since April 2003, and

4   indeed referred her to the Employee Assistance Program, long before he decided to terminate her.

5   Second, Defendant set forth evidence that shows that its decision to terminate Plaintiff was based on

6   a legitimate, non-discriminatory reason, specifically, performance issues culminating in the February

7   20, 2004 store closing incident.  Other than pointing to the timing of her termination, Plaintiff has

8   offered no evidence, either direct or circumstantial, to suggest that the reasons articulated by

9   Defendant for her termination were pretextual.  As noted above, however, Defendant presented

10  evidence that defeats Plaintiff's reliance on timing by establishing that Dowers tentatively decided

11  to terminate Plaintiff before she brought up any change in her medications during the February 23rd

12  conversation, and finalized the decision before Plaintiff's request for medical leave on February 27,

13  2004.  Defendant did not need to change its course of action and retain Plaintiff just because she

14  made a request for leave or accommodation after the termination decision was underway, even

15  though it was not yet finalized.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)

16  ("Employers need not suspend previously planned transfers upon discovery that a Title VII suit has

17  been filed, and their proceeding along lines previously contemplated, though not yet definitively

18  determined, is no evidence whatever of causality").

19        **D. Plaintiff's Claim of Violation of the California Family Rights Act**

20        Plaintiff argues that Defendant is liable under the California Family Rights Act, which

21  provides for unpaid medical leave of up to twelve weeks.  Cal. Gov. Code § 12945.2. (2005).  An

22  employee may be entitled to leave for her own serious health condition if the condition "makes the

23  employee unable to perform the functions of the position of that employee[.]"  Id. § 12945.2

24  (c)(3)(C).  Plaintiff argues that Defendant violated CFRA by failing to provide her with the requisite

25  notice and by denying her request for medical leave.

26        Plaintiff sent her belated request for medical leave three days after she had been suspended

27  with pay on February 24, 2004, two days after she told her psychiatrist that she thought that she was

28  going to be fired, and one day after Dowers finalized his decision to terminate her and after Marks

United States District Court

For the Northern District of California

1   processed Plaintiff's termination paperwork.  See Dowers Decl. ¶ 38; Charles Dep. at 372:11-19;

2   Thompson Decl., Ex. 86 (Dr. Roberts Dep.) at 120:15-121:13, Ex. 88 (Dr. Roberts' notes); Marks

3   Decl. ¶ 25, Ex. 52.  Yet Plaintiff knew Nike's procedure for requesting a medical leave, having done

4   so in 2003 when she took a two month medical leave.  Charles Dep. at 345:23-346:11; Dowers

5   Decl., Ex. 37.  Plaintiff accordingly could have asked for leave earlier, before realizing that she was

6   about to be terminated.  The purpose of CFRA is "to give employees an opportunity to take leave

7   from work for certain personal or family medical reasons without jeopardizing job security."  Nelson

8   v. United Techs., 74 Cal. App. 4th 597, 606 (1999).  Here, Plaintiff's employer had already decided

9   to terminate her, and she had no position to return to after any leave.  Cf. Clark County Sch. Dist.,

10   532 U.S. at 272 (holding that employers need not change previously contemplated although not

11   finalized actions because employee has filed Title VII action in order to avoid retaliation claim).

12   Even though Defendant decided to terminate her and has provided contemporaneous email

13   correspondence documenting that its decision was final before receiving Plaintiff's FMLA request,

14   Plaintiff would force Nike to grant her medical leave because she was able to submit an eleventh-

15   hour request the evening before she was to meet with Dowers to hear his decision on her

16   termination.  The Court does not read CFRA to mandate such a result.

17        **E. Plaintiff's Claim of Retaliation**

18        California Government Code section 12940 makes it unlawful for "any employer to

19   discharge, expel, or otherwise discriminate against any person because the person has opposed any

20   practices forbidden under this part . . . ."  Plaintiff argues that Defendant violated section 12940 by

21   retaliating against her for opposing racial discrimination by Ott and gender discrimination by

22   Dowers, and for asserting her rights as a disabled employee.  In addition, she claims that she

23   suffered retaliation because she requested medical leave.  To establish a prima facie retaliation claim

24   under FEHA or CFRA, Plaintiff must establish that:  (1) she engaged in protected activity; (2) she

25   was subjected to an adverse employment action by Nike; and (3) there is a link between the

26   protected activity and the adverse employment action.  See Manatt v. Bank of Am., N.A., 339 F.3d

27   792, 800 (9th Cir. 2003); Barnett, 228 F.3d at 1121; Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th

28   1028, 1042 (2005) (same framework applies to retaliation claims under FEHA).  Plaintiff met the

United States District Court

For the Northern District of California

1   first two prongs: she engaged in protected activity in her February 19, 2003 conversation with Marks

2   regarding Ott's racially disparate treatment of others, her February 23, 2004 conversation with

3   Dowers regarding Ott's disparate treatment of her, and her February 27, 2004 request for medical

4   leave.  Plaintiff plainly suffered an adverse action in her termination.

5           Plaintiff's claim of retaliation falters, however, on the third prong of a causal connection

6   between her termination and her protected activity.  Plaintiff pointed out the close timing between

7   her February 19, 2003 complaint to Marks that Ott treated other African American employees and

8   customers differently, and her receipt of a revised written reminder for performance on February 27,

9   2003.  Charles Decl. ¶¶ 22-23.  She also pointed out that she complained to Dowers that Ott

10  discriminated against her because of her race on February 23, 2004, and submitted a request for

11  leave on February 27, 2004, and that she received her termination letter a few days later.  Defendant,

12  however, provided undisputed evidence that defeats the inference of retaliation created by this

13  timing.  It established that Ott drafted the original written reminder in January, 2003, but then took a

14  leave of absence for six weeks due to her mother's illness and death.  Ott Decl. ¶ 19.  She asked

15  Dowers to issue the written reminder, and he gave it to Plaintiff on February 15, 2003, *before*

16  Plaintiff first complained to Marks about racism and favoritism at Niketown.  Upon her return to

17  work, Ott revised the written reminder in insignificant respects only to change dates that had slipped

18  because of Ott's leave, and Plaintiff admitted that the substance of the reminder was correct.  See id.

19  ¶ 20, Exs. 11-12 (redline and revised versions of written reminder); Charles Dep. at 196:2-198:19

20  (admitting that facts in revised version are correct, explaining that dates in original version were

21  erroneous, and agreeing that she made sure revised version was accurate before signing it).

22          Nor is the February 2003 conversation with Marks sufficient to raise a triable issue as to her

23  termination, which occurred one year later.  See Manatt, 339 F.3d at 802 (no inference of causation

24  where nine months elapsed between protected activity and adverse action); Morgan v. Regents of the

25  Univ. of Cal., 88 Cal. App. 4th 52, 69 (2000) (adverse action must follow within "relatively short

26  time" after protected activity).  Similarly, Dowers had tentatively decided to terminate Plaintiff in

27  the wake of the store closing incident, before she told him that Ott was racist, and before she

28  submitted her FMLA request.  Plaintiff accordingly has not raised a triable issue that Defendant's

24

1    stated reasons were pretextual.  Again, as the Supreme Court stated:  "Employers need not suspend

2    previously planned transfers upon discovery that a Title VII suit has been filed, and their proceeding

3    along lines previously contemplated, though not yet definitively determined, is no evidence

4    whatever of causality" (Clark County Sch. Dist., 532 U.S. at 272); see also Cichon v. Exelon

5    Generation Co., 401 F.3d 803, 811 (7th Cir. 2005); Chen v. County of Orange, 96 Cal. App. 4th 926,

6    948-49 (2002).

7        **F.  Plaintiff's Claims for Wrongful Termination and Intentional Infliction of
            Emotional Distress**

8

9        For the same reasons that Plaintiff's claims for violation of FEHA and CFRA fail, her

10   wrongful termination claims based on violations of those statutes also fail.  Similarly, Plaintiff has

11   failed to raise a triable issue of fact that Defendant's conduct was so extreme and outrageous as to

12   "exceed all bounds of that usually tolerated in a civilized society."  King v. AC & R Adver., 65 F.3d

13   764, 770 (9th Cir. 1995) (citing Schneider v. TRW, Inc., 938 F.2d 986, 992 (9th Cir. 1991)); see also

14   Cole v. Fair Oaks Fire Protection Dist., 43 Cal. 3d 148, 160 (1987) ("Employers are necessarily

15   aware that their employees will feel distressed by adverse personnel decisions, while employees may

16   consider such adverse action to be improper and outrageous.  Indeed, it would be unusual for an

17   employee *not* to suffer emotional distress as a result of an unfavorable decision by his employer").

18   Plaintiff has not raised a triable issue of fact that Defendant subjected her to extreme and outrageous

19   conduct before she was terminated, or to anything beyond normal workplace conflict and stress.  As

20   set forth above, Plaintiff has not raised a triable issue that her termination was improperly motivated.

21   Nor has she created a triable issue that the manner in which she was terminated was improper.  On

22   the contrary, the record shows that Dowers gave Plaintiff a chance to change his mind after he

23   tentatively decided to terminate her; at least four Nike managers conferred and agreed before the

24   final decision to terminate Plaintiff was made; Dowers made an appointment with Plaintiff to discuss

25   her employment status, which Plaintiff cancelled; and Marks informed her of her options for

26   appealing her termination and her eligibility for the EAP.

27   //

28   //

25

1

**V. CONCLUSION**

2      For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary

3   Judgment on each of Plaintiff's claims.

4

5      **IT IS SO ORDERED.**

6

7   Dated: December 22, 2005

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California